**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRYSTAL RODRIGUEZ, on behalf of herself, all others similarly situated, and the general public, | Case No: 23-cv-00054-BTM-JLB |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | |
| ENDANGERED SPECIES CHOCOLATE, LLC, | Judge:      Hon. Barry Ted Moskowitz |
| Defendant. | |

1    Plaintiff Crystal Rodriguez, on behalf of herself, all others similarly situated, and the
2    general public, by and through her undersigned counsel, hereby sues Endangered Species
3    Chocolate, LLC ("ESC"), and alleges the following upon her own knowledge, or where she
4    lacks personal knowledge, upon information and belief, including the investigation of her
5    counsel.

## **INTRODUCTION**

7    1.    ESC markets and sells a variety of dark chocolate bars, including:

- Bold + Silky Dark Chocolate 72% Cocoa;
- Strong + Velvety Dark Chocolate 88% Cocoa;
- Natural Dark Chocolate with Hazelnut Toffee - 72% Cocoa;
- Natural Dark Chocolate with Forest Mint - 72% Cocoa;
- Natural Dark Chocolate with Espresso Beans - 72% Cocoa;
- Natural Dark Chocolate with Cherries - 72% Cocoa;
- Natural Dark Chocolate with Cranberries & Almonds - 72% Cocoa;
- Natural Dark Chocolate with Blueberries – 72% Cocoa;
- Caramel Sea Salt + Dark Chocolate 60% Cocoa; and
- Natural Dark Chocolate with Sea Salt & Almonds - 72% Cocoa.

Collectively, these are hereafter referred to as the "Products."[1]

---

[1] ESC sells the Products throughout the United States, including in California, at major grocery and retail stores like Target, Rite-Aid, Ralph's, Albertson's and Kroger. The Products are also sold in more niche "natural" stores like Whole Foods, Lazy Acres, and Lassens Natural Foods. ESC also sells the Products online.

2.      A December 2022 report by Consumer Reports states that "[r]esearch has found that some dark chocolate bars contain cadmium and lead—two heavy metals linked to a host of health problems in children and adults," in amounts such that "eating just an ounce a day would put an adult over a level that public health authorities and [Consumer Report's] experts say may be harmful for at least one of those heavy metals." Among those containing substantial levels of lead is the Bold + Silky Dark Chocolate 72% Cocoa, as pictured below.



3.      As shown above, the Bold + Silky contains nearly double California's maximum allowable dose level (MADL) for lead and, as discussed in more detail below, there is no safe level of lead in food products.

4.      Each of the other Products, including Natural Dark Chocolate with Hazelnut Toffee - 72% Cocoa, Natural Dark Chocolate with Forest Mint - 72% Cocoa, Natural Dark Chocolate with Espresso Beans- 72% Cocoa, Natural Dark Chocolate with Cherries - 72% Cocoa, Natural Dark Chocolate with Blueberries - 72% Cocoa, Natural Dark Chocolate with Cranberries & Almonds - 72% Cocoa, Caramel Sea Salt + Dark Chocolate 60% Cocoa, Natural Dark Chocolate with Sea Salt & Almonds - 72% Cocoa and Strong + Velvety Dark Chocolate 88% Cocoa, were tested by other independent experts in February 2022 and contained levels of lead in excess of the 0.5µg per serving MADL. The levels of lead ranged

from 0.7μg (1.4 times the MADL) up to 2.0μg per serving, which is **400%** of the MADL. The lead content of each product is shown below:[2]

| Product | Test Date ▼ | Lead (μg/serving) |
|---|---|---|
| Endangered Species Chocolate Strong + Velvety Dark Chocolate 88% Cocoa | 02/2022 | 1.8 |
| Endangered Species Chocolate Strong + Velvety Dark Chocolate 88% Cocoa | 02/2022 | 1.7 |
| Endangered Species Chocolate Natural Dark Chocolate with Sea Salt & Almonds- 72% Cocoa | 02/2022 | 1.6 |
| Endangered Species Chocolate Natural Dark Chocolate with Forest Mint - 72% Cocoa | 02/2022 | 0.7 |
| Endangered Species Chocolate Natural Dark Chocolate with Blueberries-72% Cocoa | 02/2022 | 1.3 |
| Endangered Species Chocolate Natural Dark Chocolate with Blueberries-72% Cocoa | 02/2022 | 1.3 |
| Endangered Species Chocolate Natural Dark Chocolate with Hazelnut Toffee - 72% Cocoa | 02/2022 | 0.7 |
| Endangered Species Chocolate Natural Dark Chocolate with Forest Mint - 72% Cocoa | 02/2022 | 1.1 |
| Endangered Species Chocolate Natural Dark Chocolate with Espresso Beans- 72% Cocoa | 02/2022 | 1.5 |
| Endangered Species Chocolate Natural Dark Chocolate with Espresso Beans - 72% Cocoa | 02/2022 | 1.5 |
| Endangered Species Chocolate Bold+Silky Dark Chocolate 72% Cocoa | 02/2022 | 1.5 |
| Endangered Species Chocolate Natural Dark Chocolate with Cherries - 72% Cocoa | 02/2022 | 2.0 |
| Endangered Species Chocolate Natural Dark Chocolate with Hazelnut Toffee - 72% Cocoa | 02/2022 | 0.7 |
| Endangered Species Chocolate Natural Dark Chocolate with Cranberries & Almonds - 72% Cocoa | 02/2022 | 0.8 |
| Endangered Species Chocolate Caramel Sea Salt + Dark Chocolate 60% Cocoa | 02/2022 | 1.0 |
| Endangered Species Chocolate Natural Dark Chocolate with Sea Salt & Almonds - 72% Cocoa | 02/2022 | 1.1 |
| Endangered Species Chocolate Natural Dark Chocolate with Cranberries & Almonds- 72% Cocoa | 02/2022 | 0.7 |

[2] https://www.asyousow.org/environmental-health/toxic-enforcement/toxic-chocolate.

*Rodriguez v. Endangered Species Chocolate, LLC*, Case No. 23-cv-00054-BTM-JLB
SECOND AMENDED CLASS ACTION COMPLAINT

5.     Lead is a heavy metal and its presence in food poses a serious safety risk to consumers because it can cause cancer, often irreversible damage to brain development, liver, kidneys, and bones, and other health problems. As Consumer Reports noted, "lead pose[s] serious health risks" and "no amount of it is considered safe."

6.     As described more fully below, consumers who purchased the Products were injured by ESC's acts and omissions concerning the presence of lead. No reasonable consumer would know, or have reason to know, that the Products contain unsafe levels of toxic heavy metals, including lead. Worse, as companies across the industry have adopted methods to limit heavy metals in their dark chocolate products, ESC has stood idly by with a reckless disregard for its consumers' health and well-being.

7.     Plaintiff brings this action against ESC on behalf of herself, similarly-situated Class Members, and the general public to enjoin ESC from deceptively marketing the Products, and to recover compensation for injured Class Members.

## PARTIES

8.     Plaintiff Crystal Rodriguez is a citizen of California and is domiciled in, and is a resident of, San Diego County, California.

9.     Defendant ESC is a citizen of Indiana. In 2004, the Endangered Species Chocolate, LLC was formed in the state of Indiana, and it has since maintained its principal place of business in Indianapolis, Indiana.[3] The only member identified in Defendant's articles of organization was DZ Enterprises, LLC. DZ Enterprises, LLC, also formed in Indiana in 2004, did not identify any specific members in its own articles of organization, but its subsequent filings have, at times, been signed by a sole identifiable member, Curtis Vander Meer. Mr. Vander Meer is also identified in Defendant's public filings as the CEO of Endangered Species, LLC. On information and belief, Mr. Vander Meer is a member of

---

[3] At that time, Defendant was originally organized as "The Raintree Group, LLC." In 2005, Defendant filed a Certificate of Amendment changing its name to "Endangered Species Chocolate, LLC."

4

or an alter ego of DZ Enterprises, LLC and is a citizen of Indiana, and none of the members or owners of the Defendant LLC are citizens of California.

## JURISDICTION & VENUE

10.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and because Plaintiff is a citizen of California and Defendant LLC is a citizen only of Indiana or, at least, has no members or owners who are a citizen of California. In addition, more than two-thirds of the members of the class reside in states other than Indiana, the only state in which ESC is a citizen, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

11.     The Court has personal jurisdiction over ESC as a result of ESC's substantial, continuous and systematic contacts with the State of California, and because ESC has purposely availed itself of the benefits and privileges of conducting business activities within the State of California, including by marketing, distributing, and selling the Products in California.

12.     Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because ESC resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

### I.     Lead is Toxic and is Present in the ESC Products at Unsafe Levels

13.     "No amount of lead is known to be safe"[4] because "there is no known safe blood lead concentration."[5] This is especially true because lead accumulates in the body with repeated exposure. Even "extremely low" levels of lead exposure were "found to reduce the

---

[4] Jessica Pupovac, *Lead Levels Below EPA Limits Can Still Impact Your Health*, NPR The Two-Way (Aug. 13, 2016). Available online at https://tinyurl.com/4vt7zvr2.

[5] World Health Organization Fact Steet, Lead poisoning. Available online at https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

cognitive capacity of children"[6] when the exposure is consistent and "prolonged intake of even [] low level[s] of lead is hazardous to human beings."[7] "Once in the bloodstream, lead is primarily distributed among three compartments – blood, mineralizing tissue, and soft tissues. The bones and teeth of adults contain more than 95% of total lead in the body."[8] However, in times of stress, "the body can mobilize lead stores, thereby increasing the level of lead in the blood," making repeated exposure, even at low levels, particularly sinister, since it is capable of lying in wait to be released into the blood at unexpected times.

14.    Along with bones, teeth and blood, many other tissues store lead in the body, including the brain, spleen, kidneys, liver, and lungs.[9] Lead has been conclusively found to have no positive physiological role in the body, "while its harmful effects are manifold."[10] The effects of lead have been well studied also at the cellular level and "heavy metals, including lead, create reactive radicals which damage cell structures, including DNA and cell membrane."[11]

15.    In particular, "young children and pregnant women especially should avoid exposure to lead."[12] Children are at particular risk when it comes to lead exposure because it can harm a child's brain development, resulting in learning and behavioral problems.[13] While the levels in any one food may be low, the cumulative effect of lead and other heavy

---

[6] Needleman HL, *et al*. "The longterm effects of exposure to low doses of lead in childhood--An 11-year follow-up report." N Engl J Med. 1990;322:83–88.

[7] Wani AL, *et al*. "Lead toxicity: a review." Interdiscip Toxicol. 2015 Jun;8(2):55-64. doi: 10.1515/intox-2015-0009. PMID: 27486361; PMCID: PMC4961898.

[8] *Id*.

[9] Dart RC, et al. "Lead. In: Dart RC, editor." Medical Toxicology. 3rd ed. Lippincot Williams and Wilkins; 2004.

[10] *Id*.

[11] Kosnett MJ. Lead. In: Olson K.R, editor. Poisoning and Drug Overdose. 5th ed. McGraw Hill Professional; 2006.

[12] https://www.asyousow.org/environmental-health/toxic-enforcement/toxic-chocolate.

[13] https://www.centerforfoodsafety.org/.

*Rodriguez v. Endangered Species Chocolate, LLC*, Case No. 23-cv-00054-BTM-JLB
SECOND AMENDED CLASS ACTION COMPLAINT

metals in the diet can be significant. Additionally, an EPA analysis has found that, for more than 70% of children in the US, the dominant source of lead exposure is from food.[14]

16.     Exposure puts children at risk for lowered IQ, behavioral problems (such as attention deficit hyperactivity disorder (ADHD)), type 2 diabetes, and cancer, among other health issues. Heavy metals also pose risks to adults. Even modest amounts of heavy metals can increase the risk of cancer, cognitive and reproductive problems, and other adverse conditions.

17.     Additionally, even for adults, exposure to lead may cause anemia, weakness, and kidney and brain damage.[15] Lead affects almost every organ and system in the body and accumulates over time, leading to severe health risks and toxicity, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death.[16] Lead can also cross the fetal barrier during pregnancy, exposing the mother and developing fetus to serious risks, including reduced growth and premature birth.[17]

18.     The Products contain lead and ESC has known as much for at least the last eight years. In 2014, ESC was put on notice that the Products contained excessive lead by testing from independent experts. And as recently as February 2022, each of the Products tested above the California MADL for lead.[18] But ESC failed to warn consumers that consuming the Products exposes them to unsafe levels of toxic heavy metals.

19.     Moreover, in December 2022, Consumer Reports, a consumer protection and advocacy organization dedicated to independent product testing, consumer-oriented research, and investigative journalism, tested 28 different dark chocolate bars for lead and

---

[14] Center for Food Safety, FDA's Outdated Lead Standards Put the Public's Health at Risk (Dec. 9, 2020). Available online at https://tinyurl.com/5fcj8uuz

[15] https://www.cdc.gov/niosh/topics/lead/health.html

[16] *Id.*

[17] Centers for Disease Control and Prevention, Childhood Lead Poisoning Prevention. Available online at https://www.cdc.gov/nceh/lead/prevention/pregnant.htm.

[18] *Id.*

*Rodriguez v. Endangered Species Chocolate, LLC*, Case No. 23-cv-00054-BTM-JLB
SECOND AMENDED CLASS ACTION COMPLAINT

cadmium. The results showed that the ESC Bold + Silky 72% Cocoa product contained 181% of the MADL for lead. The MADL standards are set by the California Office of Environmental Health Hazard Assessment ["OEHHA"].

20.    Notably, the lead is getting into the Products *after* harvesting. As Consumer Reports notes, "lead seems to get into cacao after beans are harvested. The researchers found that the metal was typically on the outer shell of the cacao bean, not in the bean itself. Moreover, lead levels were low soon after beans were picked and removed from pods but increased as beans dried in the sun for days. During that time, lead-filled dust and dirt accumulated on the beans." A committee of experts formed to investigate ways to reduce lead found in chocolate bars concluded, in part, that the lead "contamination in chocolate products [occurs] during *post-harvest processing* and not from the uptake of [lead] in the nib."[19] Those same experts recommend that reducing the lead in the products will come from changes to "agricultural, manufacturing, [and/or] business practices"[20] and, therefore, reducing (or perhaps even eliminating) toxic heavy metals in the Products is not unreasonable.

21.    A report from the *Seattle Times* further notes that "lead levels are influenced by where and how the cacao beans are handled by humans after harvest."[21]

22.    In short, ESC could have implemented changes to harvest and manufacturing processes (or ensured it was doing business with farmers and manufacturers that implemented such measures) to eliminate, or at least significantly reduce, toxic heavy metal contamination in the Products it sold to Plaintiff and the public, but chose not to. Thus, on information and belief, ESC itself is responsible for the unsafe levels of toxic heavy metals being present in the Products, at least at the levels at which they are found.

---

[19] Expert Investigation Related to Cocoa and Chocolate Products, Final Report (Mar. 28, 2022). Available online at https://tinyurl.com/239zv83d.

[20] *Id.*

[21] Vonnai Phair, *How heavy metals get into dark chocolate bars*, Sea. Times (Feb. 10, 2023). Available online at https://tinyurl.com/mw58v97k.

## II.    Reasonable Consumers Do Not Expect Heavy Metals in the ESC Products; ESC Nevertheless Failed to Disclose the Presence of Lead in the Products

23.    The global dark chocolate market has witnessed significant growth in recent years and is expected to continue growing into 2023.[22]

24.    The growth of dark chocolate sales is premised, in part, on reasonable consumers' belief that dark chocolate is actually *healthier* than other food choices, and especially healthier than other confectionaries, specifically milk chocolates. Specifically, consumers understand that the higher cacao content in dark chocolate products results in greater antioxidant benefits. "The pervasive health and wellness trend continues to influence dark chocolate market, with manufacturers incorporating organic ingredients and natural sweeteners. The preference for dark chocolate over milk chocolates on accounts its health benefits continues to remain intact," especially as demand for healthy products, generally, increases.[23] Thus, the safety and health effects of the Products are material facts to reasonable consumers.

25.    Given the negative effects of toxic lead on human development, especially in embryos and children, and on adult health, the presence of toxic heavy metals in the Products is a material fact to reasonable consumers, including Plaintiff and members of the Class.

26.    A food company like ESC, that is self-described as "passionate about bringing authentic chocolate to the marketplace with real, responsibly sourced, health-conscious ingredients and no mysterious sweeteners or additives"[24,25] has earned significant public trust that its chocolate bars do not contain unsafe levels of toxic heavy metals, and are otherwise

---

[22] https://www.persistencemarketresearch.com/market-research/dark-chocolate-market.asp
[23] *Id.*
[24] Endangered Species Chocolate Press Release, available online at https://www.chocolatebar.com/wp-content/uploads/2020/06/Endangered-Species_Oat-Milk-Chocolate-Chips_Press-Release_.pdf
[25] Endangered Species Chocolate YouTube Channel, available online at https://www.youtube.com/channel/UC5tg3iTIMy7SYDYUzHYG00w

safe and fit for regular consumption. Reasonable consumers believe that ESC would not sell products that contain unsafe toxic metals, including lead.

27.   ESC knew that if the presence of toxic heavy metals in its Products was disclosed to Plaintiff and the Class Members, they would be unwilling to purchase the Products, or would pay less for them.

28.   In light of ESC's knowledge that Plaintiff and the Class Members would be unwilling to purchase the Products or would pay less for the Products if they knew that the Products contained unsafe levels of toxic heavy metals, ESC intentionally and knowingly concealed this fact from Plaintiff and the Class Members and did not disclose the presence, or the risk of presence, of potentially unsafe levels of lead on the labels of the Products.

29.   ESC knew or should have known that Plaintiff and the Class Members would rely upon the packaging of the Products and intended for them to do so but failed to disclose the presence of lead.

30.   ESC knew or should have known that it owed consumers a duty of care to adequately test for lead and other heavy metals, particularly considering that it was provided notice of independent expert testing over may years of its various Products. Had ESC done so, it would have known that its Products contained significant levels of lead. Alternatively, ESC *did* know that its Products contained significant levels of heavy metals and purposely hid that fact from consumers.

31.   Additionally, ESC knew or should have been aware that a reasonable consumer would consume the Products regularly, and possibly multiple Products daily, leading to repeated exposure to lead, which accumulates in the body and its systems over time.

32.   ESC knew or should have known it could control the levels of lead in the Products by properly monitoring for heavy metal presence, sourcing ingredients with less heavy metals, or none at all, adjusting its formulation to reduce or eliminate heavy metals, or improving its manufacturing process to eliminate introduction of lead caused by ESC itself.

33.     Prior to purchasing the Products, Plaintiff and the Class Members were exposed to, saw, read, and understood the labels of the Products, and relied upon the labels in purchasing the Products, but ESC failed to disclose the presence of heavy metals, including lead.

34.     As a result of ESC's concealment of the fact that the Products contained toxic heavy metals, including lead, Plaintiff and the Class Members reasonably believed the Products were free from substances that would negatively affect their health.

35.     Plaintiff and the Class Members purchased the ESC Products in reliance upon ESC's labels that contained omissions.

36.     Had Plaintiff and the Class Members known that the Products contained toxic heavy metals, rendering them unsafe for consumption, they would not have been willing to purchase the Products, or would have paid less for them.

37.     Therefore, as a direct and proximate result of ESC's omissions concerning the Products, Plaintiff and the Class Members purchased the Products and paid more than they were worth.

38.     Plaintiff and the Class Members were harmed in the form of the monies they paid for the Products which they would not otherwise have paid had they known the truth about the Products. Since the presence of unsafe levels of toxic heavy metals, including lead, in the Products renders them unsafe for human consumption, the Products that Plaintiff and the Class Members purchased are worthless, or at a minimum are worth less than Plaintiff and the Class Members paid for them.

III.    **The Products' Labeling Violates California and Federal Food Labeling Law**

39.     The Products' labeling violates California Health and Safety Code §§ 109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant

thereto."). Specifically, ESC "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products given that they contain lead, which is unsafe in any amount. In addition, such facts include the detrimental health consequences of consuming the Products, including inhibiting neurological function, anemia, kidney damage, seizures, and in extreme cases, coma and death, which are all material to a consumer choosing a food product.

## IV.   Plaintiff's Purchase, Reliance, And Injury

40.   Ms. Rodriguez regularly purchased the ESC Bold + Silky Dark Chocolate 72% Cocoa during the Class Period, often making her purchases from Whole Foods and Sprouts stores in San Diego, including at least the Whole Foods at 8825 Villa La Jolla San Diego, California and Sprouts locations at 3015 Clairemont Dr. and 3358 Governor Dr., in San Diego, California.

41.   When purchasing the ESC Bold + Silky Dark Chocolate 72% Cocoa, Ms. Rodriguez was seeking chocolate bars she believed to be premium, or of a higher quality, than other confectionaries, and ones that did not contain any unsafe levels of toxic heavy metals – specifically like the kinds promised by ESC: "premium chocolate" made "with real, responsibly sourced, health-conscious ingredients and no mysterious sweeteners or additives." Moreover, Ms. Rodriguez would have avoided any food she knew contained unsafe levels of toxic heavy metals like lead. She would also have avoided purchasing any food she knew could increase her risk of inhibited neurological function, anemia, kidney damage, seizures, coma, or death.

42.   Plaintiff acted reasonably in purchasing the ESC bars, whose labels did not disclose the presence of lead, or the attendant health risks in consuming them.

43.    By omitting that its Products contains lead, ESC was able to gain a greater share of the snack market, specifically the confectionary and dark chocolate market, than it would have otherwise and to increase the size of the market.

44.    Plaintiff and the Class Members paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent ESC's omissions regarding the lead content described herein.

45.    Plaintiff and the Class Members would not have purchased the Products if they had known that they were misbranded pursuant to California and FDA regulations, or that they contained toxic lead in the amounts found in the Products.

46.    For these reasons, the Products were worth less than what Plaintiff and the Class Members paid.

47.    Plaintiff and the Class lost money as a result of ESC's omissions and unfair practices in that they did not receive what they paid for when purchasing the Products.

48.    Plaintiff still wishes to purchase dark chocolate products, and continues to see the ESC dark chocolate Products at the stores she regularly shops. She would purchase the ESC Products in the future if, because of an injunction requiring ESC to disclose lead when present, she could be assured, by the absence of a disclosure, that the Products no longer contained unsafe levels of toxic metals, including lead. But unless ESC is enjoined in the manner Plaintiff requests, she may not be able to reasonably determine whether the lead in the Products has been addressed, or whether ESC is continuing to omit its presence. Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely with confidence on representations such as those made by ESC, continues to be violated every time Plaintiff is exposed to the Products' labels.

49.    ESC's unfair business practices that result in higher concentrations of toxic heavy metals, including lead, being present in the Products than are present in the cacao beans from which they are made should also be enjoined. Absent such an injunction, Plaintiff

cannot be assured that ESC has stopped this unfair business practice which unnecessarily concentrates amount of heavy metals in the Products.

50.     Plaintiff's legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

51.     While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to represent a class of all persons in the United States, or alternatively in California, who, at any time from four years preceding the date of the filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, the ESC Products (the "Class").

52.     The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

53.     Questions of law and fact common to Plaintiff and the Class include:

      a.     whether the omissions on the Products' labels with respect to lead content is material, or likely to be material, to a reasonable consumer;

      b.     whether the omissions regarding lead content was reasonably likely to deceive a reasonable consumer;

      c.     whether ESC's conduct violates public policy;

      d.     whether ESC's conduct violates state or federal food statutes or regulations;

      e.     whether ESC made and breached warranties;

      f.     the proper amount of damages, including punitive damages;

      g.     the proper amount of restitution;

      h.     the proper scope of injunctive relief; and

      i.     the proper amount of attorneys' fees.

54.     These common questions of law and fact predominate over questions that affect only individual Class Members.

55.     Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to ESC's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the Products and suffered economic injury because the Products are misrepresented. Absent ESC's business practice of deceptively and unlawfully labeling the Products by omitting material information regarding their toxic lead content, Plaintiff and Class Members would not have purchased the Products or would have paid less for them.

56.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

57.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

58.     ESC has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

59.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

60.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

15

61.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

62.    Under California Business & Professions Code §17200, any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice.

63.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

### Fraudulent

64.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

65.    As set forth herein, ESC's omissions regarding the toxic lead content of the Products are likely to deceive reasonable consumers and the public.

### Unlawful

66.    As set forth herein, ESC's omissions are "unlawful" under the UCL in that they violate at least the following laws:

- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;
- The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;
- The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and
- The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

67.    By violating these laws, Defendant has engaged in unlawful business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code § 17200.

### Unfair

68.    ESC's conduct with respect to the labeling, advertising, and sale of the Products was unfair because ESC's conduct was immoral, unethical, unscrupulous, or substantially

injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

69.     ESC's conduct including during post-harvesting, processing, storing, and ultimate sale of the Products to consumers was unfair because it unnecessarily introduced additional amounts of lead into the Products. Specifically, a significant amount of the lead found in the Products sold at retail is introduced into the beans after they were picked and removed from pods, and then again, more heavy metals are introduced into the final retail Products. ESC's unfair business practices ultimately led to unsafe levels of toxic heavy metals being present in the Products.

70.     ESC's conduct with respect to the labeling, advertising, and sale of the Products was also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, the Song Beverly Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

71.     ESC's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by ESC through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products unaware that they contain unsafe levels of toxic lead and is of the type that can increase the risk of poor health. Consumers could not have reasonably avoided the harm because this would have required that they conduct their own research into the lead content of the Products, which could only feasibly be revealed by laboratory testing, which is not a reasonable expectation. Further, the harm could have easily been avoided by ESC as it would have cost them only minimally to disclose on the labels that the Products contain, or are at risk for containing, unsafe levels of lead. Alternatively, ESC could have done more to ensure toxic heavy metals, including lead, were not in the Products.

17

72. ESC profited from the sale of the falsely, deceptively, and unlawfully advertised the Products to unwary consumers.

73. Plaintiff and Class Members are likely to continue to be damaged by ESC's deceptive trade practices, because ESC continues to disseminate misleading information. Thus, injunctive relief enjoining ESC's deceptive practices is proper.

74. ESC's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of ESC's unlawful conduct.

75. In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining ESC from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

76. Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

77. Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate Plaintiff for all of ESC's challenged behavior.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law

### Cal. Bus. & Prof. Code §§ 17500 *et seq.*

78. Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

79. California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code § 17500.

80. As set forth herein, the Plaintiff purchased ESC Products based on the label, which constituted advertising and which omitted the presence of toxic lead in the Products.

81.     Plaintiff and the Class Members paid money for the Products. However, they did not obtain the full value or any value of the Products due to ESC's omissions regarding the nature of the Products. Accordingly, Plaintiff and the Class Members suffered an injury in fact and lost money or property as a direct result of ESC's omissions.

82.     ESC's conduct is ongoing and continuing, such that prospective injunctive relief is necessary, especially given Plaintiff's desire to purchase ESC products in the future and hopes to rely on ESC's marketing and packaging.

83.     Plaintiff and members of the Class are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Products.

84.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of ESC products is determined to be an amount less than the premium price. Without compensation for the full premium price, Plaintiff would be left without the parity in purchasing power to which she is entitled.

85.     Injunctive relief is also appropriate, and indeed necessary, to require ESC to provide full and accurate disclosures regarding the Products so that Plaintiff and Class members can reasonably rely on the Products' packaging, as well as those of ESC's competitors, who may then have an incentive to follow ESC's deceptive practices, further misleading consumers.

86.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full price or full premium price, and an injunction requiring either (1) adequate disclosures of the existence of toxic lead in the Products or (2) the removal of lead from the Products, will ensure that Plaintiff and other Class Members are in the same place they would have been in had ESC's wrongful conduct not occurred, *i.e.*, in the position to make an informed decision about the purchase of the Products absent omissions.

87.     Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of warranty claims), and restitution is not limited to returning to Plaintiff and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

### THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act

### Cal. Civ. Code §§ 1750 *et seq.*

88.     Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

89.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

90.     ESC's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

            a.  § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

            b.  § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

            c.  § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

91.    ESC profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

92.    ESC's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

93.    Pursuant to California Civil Code § 1782, more than 30 days before filing this amended complaint, Plaintiff sent written notice of her claims and of ESC's particular violations of the Act to ESC by certified mail, return receipt requested, but ESC has failed to implement remedial measures.

94.    Plaintiff and the Class have suffered harm and seek (a) actual damages resulting from purchases of the Products sold throughout the Class Period to all Class Members, (b) punitive damages, (c) injunctive relief in the form of modified advertising and a corrective advertising plan, (d) restitution, and (e) attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

95.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue was filed with the original complaint. *See* Dkt. 1-2.

## FOURTH CAUSE OF ACTION

## Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314

96.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

97.    As set forth herein, ESC manufactured and sold the Products, and prior to the time the Products were purchased by Plaintiff and other Class Members, impliedly warranted that the Products were of merchantable quality and fit for its ordinary use, consumption by consumers, including children.

98.    ESC is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were merchantable.

99.   ESC impliedly warranted to retail buyers that the Products were merchantable in that they (a) would pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used. Defendant breached this implied warranty because the Products were unsafe in that they contained unsafe levels of toxic lead. Therefore, the Products would not pass without objection in the trade or industry and was not fit for the ordinary purpose for which they are used, which is consumption by consumers, including children and pregnant women.

100.   ESC was on notice of this breach as it was aware of the lead in the Products, including based on receiving notice in at least 2018.

101.   As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and the Class have been injured and harmed because they would not have purchased the Products, or would have paid less for them if they knew the truth about the Products, namely, that they contained unsafe levels of toxic lead.

102.   As a result, Plaintiff seeks actual damages, including, without limitation, expectation damages.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

103.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

104.   ESC's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiff's and Class Members' purchases of the Products, and the economic benefits conferred on ESC are a direct and proximate result of its unlawful and inequitable conduct.

105.   It would be inequitable, unconscionable, and unjust for ESC to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

*Rodriguez v. Endangered Species Chocolate, LLC*, Case No. 23-cv-00054-BTM-JLB
SECOND AMENDED CLASS ACTION COMPLAINT

106.   As a result, Plaintiff and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by ESC as a result of such business practices.

## **PRAYER FOR RELIEF**

107.   Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public, prays for judgment against ESC as to each and every cause of action, and the following remedies:

 a.   An Order declaring this action to be a proper class action, appointing Plaintiff as Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

 b.   An Order requiring ESC to bear the cost of Class Notice;

 c.   An Order compelling ESC to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending Products;

 d.   An Order compelling Equal Exchange to cease its unfair business practices which unnecessarily result in concentrating high levels of heavy metals in the Products;

 e.   An Order requiring ESC to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

 f.   An Order requiring ESC to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

 g.   An Order requiring ESC to pay compensatory damages and punitive damages as permitted by law;

 h.   An award of attorneys' fees and costs; and

 i.   Any other and further relief that Court deems necessary, just, or proper.

*Rodriguez v. Endangered Species Chocolate, LLC*, Case No. 23-cv-00054-BTM-JLB
SECOND AMENDED CLASS ACTION COMPLAINT

1

## **JURY DEMAND**

2

     108.   Plaintiff hereby demands a trial by jury on all issues so triable.

3

4

Dated: March 17, 2023            /s/  Trevor Flynn

5

                      **FITZGERALD JOSEPH LLP**

6

                      JACK FITZGERALD
                      *jack@fitzgeraldjoseph.com*

7

                      PAUL K. JOSEPH
                      *paul@fitzgeraldjoseph.com*

8

                      MELANIE PERSINGER
                      *melanie@fitzgeraldjoseph.com*

9

                      TREVOR M. FLYNN
                      *trevor@fitzgeraldjoseph.com*

10

                      CAROLINE S. EMHARDT

11

                      *caroline@fitzgeraldjoseph.com*

12

                      2341 Jefferson Street, Suite 200
                      San Diego, California 92110

13

                      Phone: (619) 215-1741

14

                      **Counsel for Plaintiff**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24